SMEAD, COLLARD & HUGHES *v.* W. B. LACEY, ASSIGNEE, ETC.

1. Equity requires that each partner shall be entitled to have the entire partnership property appropriated to the satisfaction of the partnership debts, and for that reason partnership creditors are preferred to individual creditors.

2. Under a general assignment for the benefit of creditors, made by A, B, and C, as partners, where a firm debt had been contracted by A and B as partners, before the admission of C, and the new contract of partnership fairly evidences that the old stock, and the increase thereof, should be subject to the debts of the old, as well as the new, firm, equity requires, from this relation of the partners, that the debts of the old and new firm shall have the equal benefit of the assets in the hands of the assignee; and an action will lie against such assignee to enforce the payment thereof.

SPECIAL TERM.—Action against the general assignee of a firm to compel the payment of a debt incurred by a former

firm, which was composed of two members of the latter firm.

The facts are sufficiently stated in the decision.

*King, Anderson & Sage*, for plaintiffs.

*Mills & Hoadly*, for defendant.

SPENCER, J. The petition in this case sets forth that, at the May term, 1851, of the commercial court of Cincinnati, the plaintiffs obtained a judgment against the firm of Butler & Brother, for $4,057.53, which is unsatisfied, except the sum of $1,254.20 paid by the estate of George H. Bates, deceased, on the 20th of October, 1852. That on the 10th of February, 1854, the firm of Butler & Brother, being insolvent, made an assignment of all its property and effects to the defendant, in trust, for the payment and distribution thereof among all the creditors of said firm, *pro rata;* that defendant accepted the assignment, and has disposed of most of the effects, and paid a dividend to other creditors of the firm to the amount of fifty per cent., and has enough in his possession to pay the plaintiffs a similar dividend; that plaintiffs have demanded payment of their just proportion of the moneys, etc., in the hands of defendant, but that the latter refuses payment, or to recognize the validity of plaintiffs' claim; wherefore, they pray judgment, etc.

The answer of the defendant sets forth that on the 10th of February, 1854, James J. Butler, Thomas S. Butler, and John Pollock, then, and previously, partners under the firm name of Butler & Brother, executed the assignment referred to in the petition, to Samuel B. Findlay, for the benefit of the creditors of said firm, *pro rata;* which trust was accepted by Findlay, and afterward surrendered and devolved upon this defendant, who accepted the same. That the judgment of the plaintiffs was rendered against Thomas S. Butler and James J. Butler alone, as partners under the firm name of Butler & Brother, upon a promissory note indorsed by them

in 1850, the said Pollock not being a member of said firm when said indorsement was made,; admits the payment of a dividend to other creditors of forty per cent., and that there is enough in hand to pay plaintiffs that much, if plaintiffs are entitled to receive it.

Avers that plaintiffs' judgment is a lien upon certain real estate in Cincinnati, which is incumbered by a mortgage lien in favor of Mary Patterson. It does not aver who is the owner of said property, but it would seem to belong to Thomas S. Butler individually, since it is said to have been conveyed to him by Clark Williams in 1846. The answer therefore prays that plaintiffs may be required to subject such real estate, before calling upon him for any proportion of the fund assigned.

It is admitted that the plaintiffs' claim against Butler & Brother accrued prior to the 1st of August, 1850, when the firm was composed of the two Butlers alone, James and Thomas. For a year before that time, Pollock was a salesman in the house, at a stipulated salary. On that day, the two Butlers entered into an article with Pollock, in these words:

" The undersigned, Thomas S. Butler and James J. Butler, under the firm of Butler & Brother, have agreed to and with John Pollock, to give him an interest in the business by them conducted. Said interest to continue for three years from the first day of August, 1850, and ending the first day of August, 1853.

" It is agreed that said John Pollock shall receive, as his share of the profits of the business, ten per cent. of the net annual profits, after all the expenses incident to the business shall have been deducted, which shall be in lieu of all other compensation, and shall be in consideration of the services to be rendered by him in the business.

" It is also understood, that notwithstanding the profits are annually made up, yet, so far as losses subsequently accrue on debts, at each annual period, deemed good, said

John Pollock shall be chargeable with his rateable proportion of said losses.

" It is also agreed that the financial and general management of the business shall still continue under the direction of the senior partner, Thomas S. Butler, and that the name and style of the firm shall continue the same as heretofore.

*Signed,*                  THOS. S. BUTLER,
                         JAS. J. BUTLER,
                         JOHN POLLOCK."

It appears from the evidence in the cause, that, for some time prior to this, Butler & Brother had been doing a large business in the city, to the amount of some $300,000 annually, chiefly on credit, involving the necessity of contracting large debts, and making heavy payments; that the business relation of Pollock, to the firm, continued as before, except that he occasionally used the name of the firm in its business; that he put his name on a small sign and posted it upon the side of the door of their place of business; that an advertisement was published in the newspapers of the city, setting forth that Pollock had been taken into the concern of Butler & Brother; that after the 1st of August, 1853, when the time limited in the article had expired, Pollock still continued in the establishment, without any new arrangement being made, occasionally acting, if need be, in the name of the firm. Notice of the dissolution of the firm was not published. Nothing was said by the parties on the subject, or as to how the business, in future, was to be conducted. No change was ever made in the books of the concern; new ones were not opened after Pollock went in, but the business was, in all respects, conducted as before. All of the debts of Butler & Brother, as well those which had been contracted prior to Pollock's coming in as those contracted since, were indiscriminately paid out of the concern, without being separately charged up to the old concern. They had all, in fact, been paid off except this of the plaintiffs, which would, no doubt, have been paid if it

had not been contested whether Butler & Brother were liable for it.

No account of stock was taken when the new concern went into operation, and nothing said between the parties on the subject.

The assignment is made in the names of all three parties; it bears date the 24th of February, 1854, and begins thus:

" This indenture, made, etc., by and between Thomas S. Butler, James J. Butler, and John Pollock, partners, doing business under the name of Butler & Brother, of the first part, etc., witnesseth that the said parties, etc., being desirous that all their creditors shall be paid, etc."

It then goes on to convey all their estate, real and personal, etc. It appears, also, that part of the stock of the old firm was on hand at the time of the assignment—how much is not known. An account was taken about two years after the formation of the new concern, and the profits ascertained. But they were not separated so as to credit the share belonging to Pollock, specially to him; Thomas S. Butler testifying that Pollock received his proportion of profits nearly in full. These are all the material facts apparent in the case.

It is difficult to say, precisely, what relation these parties intended to sustain to each other. Nor does it seem to me very material to inquire. They certainly intended, in some respects, to form the relation of partners. In their original articles, they stipulated that Pollock shall have an interest in the business conducted by Butler & Brother. That he is to receive, as his share of the profits of the business, ten per cent. net. That the financial and general management of the business shall continue under the direction of the senior partner, Thomas S. Butler, thus acknowledging the relation of partnership; and that the name and style of the firm shall continue as before. They gave a practical construction to the articles, by allowing Pollock to use the name of the firm and transact business on its account, and by holding him out to the world as connected with them as a partner; and,

finally, in the assignment itself, they all unite in the transfer of the property, and speak of themselves as partners in business.

And yet it is equally apparent that they did not contemplate a change in the ownership of the stock or property, however the law may so regard it; and it is very certain that they all contemplated that all the old stock, as well as the new purchases, should be applied indiscriminately to the payment of the debts of the old as of the new firm. In fact, it would seem as if they did not distinguish that there had been more than the one firm. Butler & Brother owed, at the time of taking Pollock in, a large amount of debts, contracted solely in their business—debts due for the very stock in hand. It would be monstrous to suppose that they did not contemplate using the stock of the house for the payment of all those debts. On the contrary, the evidence is, that they did use the stock, new and old, indiscriminately, for the payment of all their debts, new and old, and the present is the only one remaining unpaid. The inference to my mind is irresistible, that they mutually pledged the stock, with its increase, to the payment of all the debts of the concern; and that, as between themselves, the Messrs. Butler had not only a right to appropriate this stock to the payment of this or any other debt of the firm, but it was as much their duty to do so, as to pay any other debt. It is claimed, however, on the part of the defendant, that this was the individual debt of Thomas S. and James J. Butler, not jointly with Pollock, and therefore the plaintiffs having no cause of action against the three partners, could not seize the property of all three, but must look to the property of the two only. Suppose this property had not been assigned, and an execution had been issued on this judgment, Thomas S. and James J. Butler would have been justified in making payment out of the firm property, as the fund appropriated for that purpose. Or, had the execution been levied upon the firm property, Pollock would not have been at liberty to resist its appropriation. Good

faith, as between him and his copartners, required that it should be thus appropriated, and not that their private property should be taken. If, in such a case, the two Butlers might, without the assent of Pollock, apply the property, so, when they come to make an assignment, they might require the same disposition to be made. The question then is this, as between the parties themselves, did they consent together, that the property of the firm should be applied to the payment of this, with other debts? If they did, then, as between themselves, it must be treated as a joint debt, and the assignment must be intended to be as well for that as for other joint debts.

Why is it that in case of an assignment by a firm, under our statute, the creditors of the individual partners are postponed to the joint creditors, and can only participate in the surplus? It is because such a course is necessary to do equity between the partners themselves; not that the partnership creditors, as such, have any claim, either at law or in equity, upon the fund superior to the individual creditors. Indeed, if the latter were the case, it is hard. to perceive why those who trusted the firm in the first instance, are not as much entitled to follow their stock into the hands of the new firm, as those who trusted the new firm for stock advanced by them to it. But as we have said, it is the equity of the partners that determines the right. This proposition is well stated by Lord Eldon, in the two cases decided by him in 6 and 11 Vesey, cited by defendant's counsel. They were both cases in bankruptcy. In 6 Ves. 119, *Ex Parte Ruffin,* one partner having bought out another, assumed the payment of the partnership debts, and gave an indemnity bond against them. A year and a half afterward, he became a bankrupt, and the joint creditors filed their petition to have the property sold as joint property, but were refused. Lord Eldon put the case upon the ground that the partnership interest ceased on the sale, and the partner selling had no right to require the other to appropriate the specific property in payment of partnership debts. That the creditors,

as such, had no claim upon the property, although it had once been partnership property. Their right must be worked out through the partners; and if the partners could not both call for the property, so neither could the creditors. But it was admitted that the case would have been different had the conveyance been made, " subject to the payment of debts," which is more analagous to the case before the court, and not " in consideration of a covenant to pay, leaving no duty upon the property, but establishing only a personal obligation upon the assignee to pay."

In 11 Ves. 5, *Ex Parte Williams,* Lord Eldon, commenting upon *Ex Parte Ruffin*, and the ground upon which it rests, says : " Among partners, clear equities subsist amounting to something like lien. The property is joint, the debts and credits are jointly due. They have equities to discharge each of them from liability, and then to divide the surplus, according to their proportion; or, if there is a deficiency, to call upon each other to make it up. But the creditor has no equity against the effects of the partnership. He may bring an action, get judgment, and execute it upon partnership effects; but when he gets them, he holds by the execution, and not in respect of any interest he has in the property while a mere creditor, not seeking an interest by suit." And, again, p. 7, he says: " It is the equity of the partners among each other, that requires the application of partnership property to partnership debts, not that of the creditors, for whom, however, a provision is thereby necessarily operated, which they could not operate for themselves, unless by action and execution."

In the case before the court, it seems to me, there was not only a duty upon the property to pay this, as well as other debts, so contemplated by the parties, but there was also an equity in the Butlers to call upon the partnership effects to pay this as an assumed firm debt, and that it would be inequitable to call upon the private property of the Butlers to pay this debt for the purpose, it might have been, of swelling the profits of Pollock. If such was the right of

the Butlers, then the plaintiffs, as their creditors, and through their equity, may work out their own claim.

This view of the case answers the proposition made by the defendant, that the real estate seized upon should be first subjected to the payment of this claim; or exhausted before the plaintiffs can claim a dividend from the assignee. If this be the individual property of either or both of the Butlers, and not of the firm, it ought not to be subjected to a debt of the firm, until the firm property is exhausted. For such is the equity between the parties.

Judgment may be entered accordingly for the plaintiffs.